**RECORD NO. 13-2428**

In The

# United States Court Of Appeals

## For The Fourth Circuit

### NADINE RANADE,

*Plaintiff – Appellant,*

**v.**

### BT AMERICAS, INCORPORATED,

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

———————

## BRIEF OF APPELLEE

———————

Jeremy M. Brown
EPSTEIN, BECKER & GREEN, PC
One Gateway Center
Newark, NJ  07102
(973) 639-8259

*Counsel for Appellee*

David B. Tatge
EPSTEIN, BECKER & GREEN, PC
1227 25th Street, NW, Suite 700
Washington, DC  20037
(202) 861-1875

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. <u>13-2428</u>      Caption: <u>Nadine Ranade v. BT Americas, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>BT Americas, Inc.</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                        ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
       See attached Rider A.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s David B. Tatge                        Date:        12/5/2013

Counsel for: BT Americas, Inc.

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on        12/5/2013        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Nadine Ranade                              by first class mail, postage prepaid
2524 Walnut Leaf Lane
Herndon, VA 20171

Appellant pro se

/s David B. Tatge                                        12/5/2013
       (signature)                                            (date)

**RIDER A**

1. BT Americas is a wholly owned subsidiary of BT United States L.L.C.

2. BT United States L.L.C. is a wholly owned subsidiary of BT Fifty-Three Limited.

3. BT Fifty-Three Limited is a wholly owned subsidiary of BT Americas Holdings Inc.

4. BT Americas Holdings Inc. is a wholly owned subsidiary of BT Fifty-One Limited.

5. BT Fifty-One Limited is a wholly owned subsidiary of BT (International) Holdings Limited.

6. BT (International) Holdings Limited is a wholly owned subsidiary of BT Holdings Limited.

7. BT Holdings Limited is a wholly owned subsidiary of British Telecommunications plc.

8. British Telecommunications plc is a wholly owned subsidiary of BT Group Investments Limited.

9. BT Group Investments Limited is a wholly owned subsidiary of BT Group plc.

## **TABLE OF CONTENTS**

**PAGE:**

TABLE OF AUTHORITIES ................................................................... iii

COUNTERSTATEMENT OF THE ISSUES ............................................ 1

STATEMENT OF THE CASE ............................................................... 2

    I.    STATEMENT OF FACTS ........................................................ 4

        A.    Plaintiff's Employment By BT ................................... 4

        B.    Ms. Ranade's Removal From The P&G Account ..................... 5

        C.    Ms. Ranade's Requested Removal From The Unilever Account ................................................................... 8

        D.    Ms. Ranade's Placement On A Performance Improvement Plan ..................................................... 10

        E.    Requested Removal From Capital Group Account And Termination ........................................................ 13

        F.    Request For FMLA Leave ......................................... 16

SUMMARY OF THE ARGUMENT ..................................................... 22

ARGUMENT ..................................................................................... 25

    I.    GOVERNING LEGAL STANDARDS ........................................ 25

    II.    BT'S STATEMENT OF FACTS WAS UNDISPUTED AND, STANDING ALONE, WARRANTS SUSTAINING THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT ....... 26

    III.    THE DISTRICT COURT CORRECTLY HELD THAT MS. RANADE COULD NOT SUSTAIN AN FMLA INTERFERENCE CLAIM ............................................... 29

i

A.  BT Accommodated Ms. Ranade's Request For A Reduced Work Schedule During the Nine-Day Period That She Qualified For FMLA Leave ............................... 30

B.  When BT Could No Longer Sustain Ms. Ranade's Requested Reduced Work Schedule, BT Met Its FMLA Obligations By Offering Her Full-Time FMLA Leave ............31

C.  There Is No Record Support For Ms. Ranade's Interference Claim Based On An Alleged "Informal Request" On An Unidentified Date In Summer 2010........ 35

D.  Ms. Ranade's FMLA Interference Claim Fails As A Matter Of Law Because She Cannot Establish Any Prejudice Caused By The Alleged Interference .................37

IV.  THE DISTRICT COURT CORRECTLY HELD THAT MS. RANADE COULD NOT SUSTAIN AN FMLA RETALIATION CLAIM .................................................39

A.  The District Court Correctly Determined That Ms. Ranade's Evaluations And PIP Were Based On Well-Documented Poor Job Performance, And Did Not Remotely Suggest A Causal Connection To Her Request For FMLA Leave ................................................40

B.  The District Court Correctly Determined That Ms. Ranade's Termination Was Based On Well-Documented Poor Job Performance, And Did Not Remotely Suggest A Causal Connection To Her Request For FMLA Leave Six Months Earlier ...............................................................46

CONCLUSION ..................................................................50

REQUEST FOR ORAL ARGUMENT ................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>:

<u>CASE</u>:

*11126 Baltimore Boulevard, Inc. v. Prince George's County*,
 58 F.3d 988 (4th Cir. 1995) (*en banc*), *overruled on other grounds by*
 *City of Littleton v. Z.J. Gifts D-4, L.L.C.*,
  541 U.S. 774 (2004) .................................................................... 27-28

*Ainsworth v. Loudon Cnty. Sch. Bd.*,
 851 F. Supp. 2d 963 (E.D. Va. 2012) .......................................... 26, 40

*Anderson v. Discovery Commc'ns, LLC*,
 517 Fed. Ap'x 190 (4th Cir. 2013) .................................... 30, 37, 38, 39

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ............................................................................ 25

*Ash v. United Parcel Service, Inc.*,
 800 F.2d 409 (4th Cir. 1986) ............................................................. 45

*Boitnott v. Corning Inc.*,
 669 F.3d 172 (4th Cir. 2012) ............................................................. 25

*Bryant v. Bell Atl. Md., Inc.*,
 288 F.3d 124 (4th Cir. 2002) ............................................................. 29

*DeLaRama v. Illinois Dep't of Human Servs.*,
 541 F.3d 681 (7th Cir. 2008) ............................................................. 37

*Edwards v. City of Goldsboro*,
 178 F.3d 231 (4th Cir. 1999) ............................................................. 27

*Foglia v. Clapper*,
 885 F. Supp. 2d 821 (E.D. Va. 2012) ................................................ 27

*Holland v. Wash. Homes, Inc.*,
 487 F.3d 208 (4th Cir. 2007) ............................................................. 25

*Hux v. City of Newport News*,
　　451 F.3d 311 (4th Cir. 2006) ........................................................25

*JDS Uniphase Corp. v. Jennings*,
　　473 F. Supp. 2d 705 (E.D. Va. 2007) ...........................................27

*King v. Rumsfeld*,
　　328 F.3d 145 (4th Cir. 2003) ........................................................49

*Lake Wright Hospitality v. Holiday Hospitality Franchising, Inc.*,
　　2009 U.S. Dist. LEXIS 73903 (E.D. Va. Aug. 20, 2009) ..............27

*Peeples v. Coaster Office Pride*,
　　64 F. App'x 860 (4th Cir. 2003) ...................................................35

*Ragsdale v. Wolverine World Wide, Inc.*,
　　535 U.S. 81 (2002) ...........................................................29, 30, 37

*Reed v. Buckeye Fire Equip.*,
　　241 F. App'x 917 (4th Cir. 2007) ............................................29, 37

*Reid v. Hospira, Inc.*,
　　2010 U.S. Dist. LEXIS 131836 (E.D.N.C. Dec. 13, 2010) ...........35

*Rhoads v. FDIC*,
　　257 F.3d 373 (4th Cir. 2001) ........................................................36

*Righi v. SMC Corp.*,
　　632 F.3d 404 (7th Cir. 2011) ........................................................36

*Yashenko v. Harrah's N.C. Casino Co., LLC*,
　　446 F.3d 541 (4th Cir. 2006) ...................................................26, 40

## **STATUTES:**

29 U.S.C. § 2612(a)(1)(D) ......................................................................26

29 U.S.C. § 2613(a) ................................................................................36

29 U.S.C. § 2613(b)(4)(B) .......................................................................36

29 U.S.C. § 2615(a)(1) .........................................................................2, 26

iv

29 U.S.C. § 2615(a)(2)................................................................2, 26

29 U.S.C. § 2617...........................................................................29

**REGULATIONS:**

29 C.F.R. § 825.117......................................................................32

29 C.F.R. § 825.302(d)..................................................................36

29 C.F.R. § 825.302(f)...................................................................32

**RULES:**

E.D. Va. Local Civ. R. 56(B).........................................................27

Fed. R. Civ. P. 56(c).....................................................................25

## <u>COUNTERSTATEMENT OF THE ISSUES</u>

1.     Did the district court correctly award an employer summary judgment on the employee's claim of "willful violation" under the Family and Medical Leave Act ("FMLA"),where the employee failed to dispute any material facts presented by the employer?

2.     Did the district court correctly award an employer summary judgment on the employee's claim for interference under the FMLA, where the employer granted the employee's request for a nine-day reduced schedule, and the employee presented no evidence of interference or prejudice?

3.     Did the district court correctly award an employer summary judgment on the employee's claim of retaliation under the FMLA where the employee presented no evidence of retaliatory animus or causal connection, and where the employee was discharged six months after the FMLA leave based on well-documented poor job performance?

## STATEMENT OF THE CASE

This case arises out of the March 2011 termination of Ms. Nadine Ranade ("Ms. Ranade") from her employment at BT Americas, Inc. ("BT"). BT is a global technology services firm with a location in Northern Virginia. Ms. Ranade worked as a Senior Consultant for approximately three years, with repeated and serious performance issues that culminated in her discharge in 2011.

Ms. Ranade's claim has been a moving target that has changed over time. Prior to filing the Complaint, Ms. Ranade filed a charge of discrimination alleging disability, gender, and national origin as the basis for her claim. When asked at her deposition the basis of her claim, she testified "I don't know. It could be. It could be anything" and then referenced her gender as the reason. Finally, Ms. Ranade's Complaint was reduced to a single, vague contention of "willful violation" of the FMLA, which the district court analyzed as "two possible claims Plaintiff could bring under the FMLA – interference (29 U.S.C. § 2615(a)(1)) and retaliation (29 U.S.C. § 2615(a)(2))." (JA 661.)

Specifically, Ms. Ranade contends that BT interfered with her FMLA leave by refusing to continue to provide her with a reduced leave schedule. BT counters that it accommodated her request for a reduced schedule for as long as Ms. Ranade was medically authorized for leave. Further, when the reduced schedule was no longer workable for the client on whose account Ms. Ranade was working at the

time, and after exploring other options, BT offered to provide Ms. Ranade with her full 12 weeks of FMLA leave. Rather than take the full leave, however, Ms. Ranade returned to work the following day with a medical certification lifting all work restrictions.

Ms. Ranade also claims that BT retaliated against her for exercising her right to FMLA leave when it lowered her performance reviews, placed her on a Performance Improvement Plan, and ultimately terminated her employment. BT counters that the Performance Improvement Plan – a first draft of which was circulated among BT personnel over one week *prior* to her request for FMLA leave – and concomitant performance reviews, had all been prepared on the heels of several prior client requests that Ms. Ranade be removed from their accounts, and that the termination of her employment immediately followed a third client request that she no longer work on its account.

The district court granted BT summary judgment dismissing the Complaint after a detailed review of the record. As an initial matter, the district court determined that because Ms. Ranade failed to dispute BT's statement of facts, the court was entitled to deem the facts as admitted. (JA 660-61.) The district court also analyzed each potential FMLA claim thoroughly and determined that Ms. Ranade could not state a cognizable claim for interference of her FMLA rights where all the undisputed evidence demonstrated that her request for an FMLA

3

accommodation was fully granted and she was not prejudiced in any manner by BT's actions. (JA 661-64.)  The district court also found that BT presented legitimate reasons for her termination – namely her well-documented performance deficiencies – while Ms. Ranade presented no evidence that those reasons were pretextual or that there was any causal connection between the discharge decision six months after her FMLA leave expired.  (JA 664-67.)

In November 2013, Ms. Ranade appealed.

I.    STATEMENT OF FACTS

Ms. Ranade did not dispute BT's statement of undisputed material facts before the district court.  (JA 660; *see* JA 11- 31.)  Accordingly, the following facts are undisputed:

A.    Plaintiff's Employment By BT

BT is a global technology services company.  (JA 659.)  On March 10, 2008, after working as a BT contractor for one year at an annual salary of $120,000, BT hired Ms. Ranade as a fulltime Consultant at its Reston, Virginia location.  (JA 11-12 ¶ ¶ 1-3; JA 38-43, 96, 125-28, 130, 659.)  Within her first year of employment, Ms. Ranade was promoted from Consultant to Senior Consultant.  In this new role, Ms. Ranade was expected to provide a professional and high technical level of consultancy, design, development, integration and support services to BT clients.

Integral to these job responsibilities was communicating in both an effective and professional manner.  (JA 12 ¶¶ 5- 6; JA 44, 60-61, 295-96.)

In mid-2009, Ms. Ranade applied for a promotion to Principal.  (JA 12 ¶ 10; JA 61, 177 ¶ 6.)  The promotion application required Ms. Ranade to assemble a comprehensive write-up detailing her prior work history, as well as supportive feedback from BT clients.  (JA 13 ¶ 11; JA 61, 177 ¶ 7.)  The application was initially deferred because it lacked sufficiently positive feedback from clients and demonstrated a lack of exposure to a national account.  (JA 13 ¶ 12; JA 62-63, 137, 177 ¶ 8.)

B.    Ms. Ranade's Removal From The P&G Account

In an effort to strengthen Ms. Ranade's promotion application, her immediate manager, Jayne Charlton, assigned Ms. Ranade to work as a Project Manager ("PM") for BT's "Transformation" team on a large project undertaken by Proctor & Gamble ("P&G") in Mehoopany, Pennsylvania.  (JA 13 ¶¶ 13, 15; JA 64, 145.)  Ms. Ranade's performance on the P&G Mehoopany project was totally unacceptable to the client and BT.

On August 4, 2009, at the outset of the project, an initial conference call was scheduled to introduce Ms. Ranade's BT team members to the client and to discuss the upcoming project.  (JA 13 ¶ 17; JA 184.)  Although Ms. Ranade accepted the

invitation, she failed to attend the introductory call and offered no explanation for her absence. (JA 13 ¶ 18; JA 184)

On August 29, 2009, two weeks after missing the introductory meeting, Ms. Ranade organized a project "kick-off" meeting among the project's key players, but failed to invite the Site Lead – the most important person from P&G. The Site Lead only learned from a colleague days later that work had begun on her project. The Site Lead "was furious" and expressed her frustration to Ms. Ranade. (JA 13-14 ¶¶ 19-20; JA 184.)

Shortly thereafter, Ms. Ranade arrived 90 minutes late to the project's first site survey meeting, forcing the client and other members of the BT team to wait for her. (JA 14 ¶ 22; JA 66, 184-85.) Even after arriving at the site, Ms. Ranade was unprepared, lacked knowledge of the processes to be undertaken, and failed to bring with her key documents required for the meeting. Consequently, a more junior BT team member had to lead the meeting. (JA 14 ¶ 22; JA 66, 184-85.)

On October 26, 2009, the P&G Site Lead once again expressed to BT's Account Manager her dissatisfaction with Ms. Ranade's continuing poor job performance, specifically referencing Ms. Ranade's lack of organization, coordination, poor project management skills, and poor communication skills. (JA 14 ¶¶ 23-24; JA 185.) Three days later, on October 29, 2009, P&G gave 30-days' notice that Ms. Ranade would be removed from the account because of

"personality conflicts." (JA 14-15 ¶ 26; JA 189.) Ms. Ranade was told that she was being removed from the P&G account. (JA 15 ¶ 27; JA 67, 151-53.)

Despite having planned for Ms. Ranade's 30-day orderly removal from P&G, that plan was abruptly terminated due to what the client described as "actions taken by [Ms. Ranade] against the account." (JA 15 ¶ 33; JA 189-90.) For example, Ms. Ranade failed to attend a conference call concerning the work she was to perform during the 30-day removal period from the account. Ms. Ranade did not provide an explanation for her failure to attend this important call. (JA 15-16 ¶ 34, JA 189-90.) Additionally, once she had received notice of her removal, Ms. Ranade inappropriately questioned the client about the reasons for her removal, further exacerbating an already bad situation. (JA 15 ¶ 29; JA 189.) Although Ms. Ranade had been told previously not to contact the client concerning her removal, she refused to follow her manager's instructions. (JA 15 ¶ 29, JA 16 ¶ 37; JA 72, 155-57, 189.) Accordingly, on November 4, 2009, after BT received an angry communication from P&G, Ms. Ranade was directed that all of her "interactions and communications with P&G (clients, vendors and team players) **are discontinued effectively immediately.**" (JA 16 ¶ 38; JA 155-57) (emphasis in original.) Ms. Ranade was directed "not to contact anyone related to P&G via phone or email, including casual/social 'good-byes or thank yous.'" (JA 16 ¶ 38; JA 155-57.)

7

In addition to creating an unacceptable situation with the client, Ms. Ranade's summary removal from the P&G Mehoopany project prompted the Review Board to deny her then-deferred application for promotion to Principal. (JA 17 ¶ 41; JA 135-41, 177 ¶ 10.) Ms. Charlton was instructed by the Chair of the Review Board that Ms. Ranade should wait to resubmit her application so that she could distance herself from the P&G situation and build client support from subsequent projects. (JA 17 ¶ 42; JA 177 ¶ 11; *see also* JA 298-300.) Ms. Ranade acknowledged that being asked to cease all communications with P&G was a "big deal" and that her removal from the project was due to her poor job performance. (JA 16-17 ¶ 40, JA 68, 70-71.)

C.    Ms. Ranade's Requested Removal From The Unilever Account

In early 2010, on the heels of the highly negative P&G situation, Ms. Ranade's performance review ratings declined. (JA 17 ¶¶ 43-44; JA 53, 55, 133, 143-49, 196-97.) In her performance review, Ms. Charlton specifically noted Ms. Ranade's need to develop her "soft skills," "communication" skills, and "relationship building" skills at which Ms. Ranade admittedly "wasn't very good." (JA 17 ¶ 45, JA 17-18 ¶ 46, JA 56-61, 143-49.) Nevertheless, Ms. Charlton secured a new PM project for Ms. Ranade with Unilever, one of BT's largest international clients. (JA 18 ¶ 47; JA 146, 518.) As the PM for the "Billing Audit by TNX" project (the "Unilever Project"), Ms. Ranade was responsible for

8

managing the audit demands for North America and Latin America. The timeline

for the project was from December 2009 through December 2010. (JA 18 ¶¶ 48-

49; JA 146.)

By summer 2010, however, Ms. Charlton had received numerous complaints

from the BT Account Director, Afshin Sepehri, who was someone Ms. Ranade

described as "very active" and "present" in the client engagement. (JA 18 ¶¶ 50-

51; JA 48-49, 135-41.) Additionally, Ms. Charlton received complaints from

Account Manager, Desmond Kerr, regarding Ms. Ranade's job performance. (JA

18 ¶¶ 50-51; JA 48-49, 135-41.) Specifically, Messrs. Sepehri and Kerr advised

Ms. Charlton that Ms. Ranade had a poor demeanor when working with team

members, lacked effective communication skills, was often absent without

explanation, and discussed personal matters that were inappropriate for the

workplace. (JA 18 ¶ 52; JA 115-16, 594.)

As a result, in August 2010, Unilever advised Messrs. Sepehri and Kerr that

the company intended to remove Ms. Ranade from the Unilever Project four

months early. (JA 18-19 ¶ 53; JA 137.) On August 26, 2010, Ms. Charlton

conducted a conference call with Ms. Ranade during which she detailed the

negative performance feedback received from Unilever, and notified Ms. Ranade

about her removal from the project four months early. (JA 19 ¶ 54; JA 76-79,

137.) After demanding Ms. Ranade's early removal, Unilever nevertheless

determined that compliance with its fast-approaching project deadline required that

Ms. Ranade be kept on the engagement through the December 31 deadline, even

though they were highly dissatisfied with her job performance.  (JA 19 ¶ 55; JA

207.)

     D.    <u>Ms. Ranade's Placement On A Performance Improvement Plan</u>

Upon receiving notice of the second request for Ms. Ranade's removal from

a client account due to poor job performance, Ms. Charlton – in  consultation with

her supervisor, Terry Schneider, and Human Resources Manager, Stephanie

Schlichting – determined that Ms. Ranade's conduct warranted placement on a 90-

day Performance Improvement Plan ("PIP").  (JA 19 ¶ 56, JA 21 ¶ 66; JA 85, 114,

135, 201, 205, 592.)  A PIP is a management tool used only when a manager

believes that the poorly performing employee has the ability to succeed in her

position, but needs additional coaching.  (JA 19 ¶ 57; JA 114, 118-19.)

During the first week of September 2010, and within two weeks of receiving

notice of Unilever's request to remove Ms. Ranade from the project, Ms. Charlton

began drafting a PIP aimed at improving Ms. Ranade's job performance.  (JA 19 ¶

58; JA 199.)  On September 10, 2010, a draft PIP was sent to Mr. Schneider and

Ms. Schlichting for comment and approval.  (JA 19 ¶ 59; JA 199.)  It is evident

from these facts, therefore, that the PIP process was well underway a full week

before Ms. Ranade made her request for FMLA leave.  The final form of the PIP

was presented to Ms. Ranade on September 14, 2010. (JA 20 ¶ 61; JA 135-41,

325.)  In addition to expressly noting that Ms. Ranade had been "asked off"

projects – at significant cost to both the Company's and her own reputation – the

following specific areas of concern were identified in the PIP:

> Nadine seems to have an issue consistently following professional, effective communications protocol and "chain of command" with her HR Mgr, Account MC, Project Team, other Key Stake holders and Client.
>
> She speaks too freely and 'out of turn' with other Managers or associates about time off, potential/desired job changes or opptys [sic], or other training or career aspirations that should be kept primary between her and her HR Mgr.
>
> Nadine often does not follow direct coaching instruction or advice designed to more effectively manage/resolve/mitigate/minimize situations that arise.  In other words, she goes against her HR MC's direction.
>
> Nadine often does not plan or communicate ahead about time off with HR Mgr, and she sporadically takes sick time or days off without advance notice or any upfront, direct notification to HR MC, Acct MC and Internal/External Client or reasonable responsiveness to voice and email msgs.
>
> Nadine's inconsistent or inappropriate communication behaviours have eroded trust, respect and rapport in key relationships with HR Mgr and other Key Stakeholders which needs to be rebuilt/improved for more sustainable relationships and a stronger, more positive network with Mgmt, Project Team and Client(s).

(JA 20 ¶ 63, JA 137-38.)

The PIP also outlined eight coaching sessions Ms. Charlton had conducted

with Ms. Ranade from September 2009 to September 2010.  The sessions included

11

topics such as "feedback from principal review board," "communication issues and premature removal from P&G," "performance on Unilever" and "negative feedback rec'd from [Unilver MC] re: 4 month premature exit." (JA 20 ¶ 62; JA 137.)

Importantly, the PIP stated that Ms. Ranade "must receive ongoing, positive, constructive feedback from clients, Account MC and Project Team Members to build positive, sustainable relationships." (JA 20-21 ¶ 65; JA 87-89, 138.) It further required that she "cannot be asked to leave an internal or external project prematurely due to her performance, capabilities, personality conflict, or communication style for the next 3 years (thru Sept of 2013)." (JA 20-21 ¶ 65; JA 87-89, 138.)

At the conclusion of the PIP on January 14, 2011, Ms. Ranade acknowledged that as a result of the coaching process, over the past few months, since the PIP had been presented to her, she had "be[come] more confident about [herself] professionally and about [her] skills," she had "developed a lot of new skills by training in developing customer relationships, negotiation and conflict resolution," and she had "improved [her] communication skills and became a better listener." She also "thanked" Ms. Charlton for her guidance.[1] (JA 21 ¶ 68; JA 212.)

---

[1] Ms. Charlton extended the PIP, from December 14, 2010 to January 14, 2011, due to Ms. Ranade's FMLA leave and the intervening holidays and vacations to provide Ms. Ranade sufficient time to meet all of its requirements. (JA 22 ¶ 66; JA 85, 135, 205, 210, 592, 667 n.4.)

12

The following week, January 24, 2011, Ms. Ranade was notified in writing that, pursuant to BT's Performance Improvement Policy #2:03, any future occurrences of poor job performance could result in the termination of her employment.  (JA 21 ¶ 69; JA 204-05.)  In accordance with BT policy, Ms. Ranade would not be granted the opportunity to participate in a second PIP.  (JA 21 ¶ 70; JA 120-21, 204-15.)

While on the PIP, Ms. Ranade received a "Development Needed" rating on her quarterly performance review.  In the review, Ms. Charlton expressly noted "the feedback" she had received from "project key stakeholders and from Mgmt observations" which indicated a "need for improvement in communications protocol and in building sustainable relationships."  (JA 22 ¶¶ 71-72; JA 133, 217-18.) Ms. Charlton also noted Ms. Ranade's need to improve client "perceptions" of her and her "reputation."  (JA 22 ¶ 72; JA 217-18.)

E.    Requested Removal From Capital Group Account And Termination

At the end of November 2010 – while still working to complete the PIP – Ms. Ranade was assigned by Ms. Charlton to be the PM for the Capital Group account, one of BT's newest clients.  (JA 23 ¶ 78; JA 135-41, 332.)  In addition to securing Ms. Ranade's placement on this project – which was not easy given her prior failures on Unilever and P&G – Ms. Charlton also arranged for a more experienced member of BT's Capital Group team to mentor Ms. Ranade.  (JA

13

599.)  At first, Ms. Ranade's performance was well-received by the client ("She was absolutely awesome when we first kicked this project off . . . .")  (JA 23 ¶ 82; JA 211.)  However, after completing the PIP and toward the end of the Capital Group project, Ms. Ranade, unfortunately, reverted to her unacceptable prior performance patterns of, among other things, poor and inappropriate communications.  (JA 23 ¶ 83; JA 159-60, 220.)

For example, in January 2011, David Upton, BT Account Manager for the Capital Group project, observed that Ms. Ranade seemed a "bit scattered" and focused more on the "wedding" she seemed to be planning rather than the client's affairs.  (JA 23 ¶ 80, JA 24 ¶ 86; JA 46-47, 220.)  In the same communication, Mr. Upton warned Ms. Charlton that he was "getting some pretty negative feedback from the BT team as of the last couple of weeks" concerning Ms. Ranade's job performance.  (JA 24 ¶ 86; JA 220.)

Two months later, Mr. Upton forwarded to Ms. Charlton the following list of client complaints concerning Ms. Ranade's performance on the account:

- Some things [Ms. Ranade] did quite well, such as her "next step plan", and other things were enough of an issue that she was asked to finish up the initial project, *but the client specifically asked David [Upton] not to bring her back for the ongoing project work.  In the end, the client said they liked some of the "product" she delivered, but not the PM [Project Manager - Ms. Ranade].*

- Issues with PM style (the "HOW"), such as challenges prioritizing project activities and discerning which are higher significance or urgency

14

- Communication/conversation challenges

- Work effort was inconsistent in quality – she seemed very good at the beginning, but her momentum diminished during the course of the project.

- Nadine seemed to be distracted by other things and thus re-asking the same questions and not up-to-date on latest info or decisions, etc. This was apparent to both the client and the BT project team.

- Didn't know EDM well, and although she tried to learn it quickly for the CO meeting, much of the docs had to be renamed on the eCEB file by the lead consultant and David [Upton].

- When preparing for close out, Nadine began trying to "sell" herself to the client for the next projects. At that point, the client told David [Upton] *that if they were going to move forward with BT, then they wanted a different PM. David asked [Ms. Ranade] to stop and told her that she was to finish up and move on.*

(JA 23-24 ¶¶ 84-85; JA 47, 92-93, 159-60) (emphasis added.)

On March 14, 2011, Ms. Charlton forwarded these negative comments to Ms. Ranade, pointing out that a number of the remarks "align with things discussed during [Ms. Ranade's] PIP." (JA 24 ¶ 87; JA 90-93.) Ms. Ranade acknowledged that the Capital Group did not want her staffed on any of its future projects. (JA 24 ¶ 88; JA 93-94.) In light of this feedback and Ms. Ranade's inability to satisfy the ongoing requirements of the PIP, including that she not backslide or be removed from any client account for performance-based reasons, Ms. Charlton, in consultation with Human Resources and Mr. Schneider, terminated Ms. Ranade's employment effective April 1, 2011. (JA 24-25 ¶ 89, JA 25 ¶ 90; JA 122-23, 302.)

15

Ms. Ranade was notified of her discharge on March 31, 2011.  (JA 25 ¶ 90; JA 302.)

F.    Request For FMLA Leave

According to Ms. Ranade, she injured her back and neck in Spring 2010 in an accident unrelated to work.  (JA 25 ¶ 94; JA 99, 228.)  After the accident, Ms. Ranade attended physical therapy starting in July 2010.  She notified Ms. Charlton that she would need to attend physical therapy sessions at times, to which Ms. Ranade testified Ms. Charlton "agreed," and advised Ms. Ranade, "go . . . get some help."  (JA 25 ¶ 95; JA 108, 587.)

After this conversation, it was not until September 13, 2010 – a week *after* the PIP had been drafted and within two weeks of receiving notice of Unilever's request that Ms. Ranade be removed from the project – that Ms. Ranade first expressed a need for FMLA leave.  (JA 19 ¶¶ 58-59, JA 25 ¶ 91; JA 133, 199, 224, 587.)  FMLA forms were promptly provided to Ms. Ranade the next day by Jan Escalante in Human Resources.  (JA 25 ¶ 92; JA 133, 224.)  Ms. Ranade submitted completed FMLA documentation, including a Certificate of Health Care Provider, on September 22, 2010.  (JA 25 ¶ 94; JA 99, 228.)  The Certification stated that Ms. Ranade could work no more than four hours per day, five days per week, from September 20 through December 15, 2010.  (JA 26 ¶¶ 97-98; JA 163-64.)  Human Resources, in consultation with Ms. Charlton, initially determined that the time

16

restrictions imposed by Ms. Ranade's physician could be accommodated by adjusting her working hours to 8:00 a.m. – 12:00 p.m. each day.  (JA 26 ¶¶ 99-102; JA 133, 229, 232-34, 236, 238-39, 276-77.)  Accordingly, as of September 23, 2010, Ms. Ranade was approved and directed to work a part-time schedule from 8:00 a.m. – 12:00 p.m.  (JA 26 ¶¶ 101-03; JA 133, 234, 236, 238-39, 243.)

The following timeline confirms that BT approved Ms. Ranade's reduced hours work schedule request:

- On September 27, 2010, three business days after Ms. Ranade submitted her doctor's Certification for FMLA leave, Ms. Escalante telephoned Ms. Ranade to inform her that her request for a four-hour work schedule for the time period September 20, 2010 to December 15, 2010, was granted.  (JA 26 ¶ 101; JA 133, 234.)

- On September 29, 2010, Ms. Escalante telephoned Ms. Ranade to remind her that she was "not to work more than 4 hours per day."  (JA 27 ¶ 109; JA 236.)

- On September 30, 2010, *Ms. Ranade* sent Ms. Escalante an email confirmation that her work hours for the time period of September 20, 2010 through October 1, 2010, were as follows:

    o    9/20 – full day work
    o    9/21 – full day work
    o    9/23 – full sick day
    o    9/24 – full sick day

17

- o    9/25 – Saturday
- o    9/26 – Sunday
- o    9/27 – full sick day
- o    9/28 – full sick day
- o    9/29 – "only 4 hrs work"
- o    9/30 – "only 4 hrs work"
- o    10/1 – "only 4 hrs work"

At the bottom of the email *Ms. Ranade* acknowledged as follows: "Note: I

will work 4 hr flex time per day and will not exceed more than 4 hrs." (JA

26-27 ¶¶ 110-11; JA 27-28, 236-37.)

- That same day, September 30, 2010, Ms. Ranade, Ms. Charlton and

  Ms. Escalante discussed the reduced schedule and Ms. Ranade's

  concern that she could not participate in meetings outside the four-

  hour window in the morning.  Ms. Escalante advised Ms. Ranade to

  "continue working the 8 a.m. to 12 p.m. schedule" and to contact Ms.

  Escalante if any problems arose.  Both Ms. Ranade and Ms. Charlton

  confirmed that they "understood" Ms. Escalante's instructions.  (JA

  28 ¶¶ 112-13; JA 248.)

- On October 4, 2010, Ms. Escalante sent Ms. Ranade an email

  (copying Ms. Charlton) in which she confirmed that, "BT is

  accommodating your restrictions as set forth by your physician

  effective 9/20/10 through 12/15/10 by having you work 8:00 a.m. to

  12:00 p.m., Monday through Friday.  If you find that there is a

problem with this accommodation, please let me know." (JA 28 ¶ 114; JA 255.)

- On October 4, 2010, Ms. Ranade sent Ms. Escalante an email again detailing her time worked through October 1, 2010, confirming that she had been accommodated with the four-hour leave schedule and stating that, "I will have my Doctor provide an updated documentation by tomorrow stating that my part time work will be effective 9/29." (JA 28-29 ¶ 115.)

Although BT was initially able to satisfy Ms. Ranade's request to work a reduced daily schedule, the client on whose behalf she was working at the time, Unilever, could not. (JA 27 ¶¶ 106-07; JA 234-35, 280-81, 286.) On September 27, 2010, Ms. Charlton was notified by Debra Gessel, one of BT's Unilever Account Managers, that Ms. Ranade's "working 8am to noon each day [was] not sufficient coverage for the [client's] activities through November 30th, since that schedule would leave her unable to participate in meetings and calls should the need arise." (JA 27 ¶¶ 106-07; JA 234-35, 280-81, 286.) The client advised that any reduced schedule must allow for flex time that would enable Ms. Ranade to work on an as-needed basis. (JA 27 ¶ 107; JA 286.)

Ms. Charlton, Escalante and Gessel had numerous discussions to try to agree on a work schedule that satisfied each of Ms. Ranade's doctor's restrictions, the

19

client's needs, and was manageable for BT. (JA 27 ¶ 108; JA 283-91.) Although the client needed Ms. Ranade to be available for four hours of "flex time" at any hour of the day, BT could only manage her on a continuous four-hour fixed schedule. Anything other than a four-hour block or fixed schedule would place an undue burden on the Company's business since it would be impossible for her managers to effectively oversee her time, manage her workload, and ensure compliance with her doctor's orders. (JA 27 ¶ 105; JA 240-41, 283-84.)

This is particularly so because, as Ms. Ranade testified, she worked nearly every day from home and, therefore, was not supervised in an office. (JA 27 ¶ 105; JA 240-41, 283-84.) As Ms. Charlton explained in her email to Ms. Ranade, BT could not permit her to work "4hrs per day haphazardly as flex time per day. This is not manageable for the business, PT [Part time] FMLA or your Dr.[doctor] care. Sorry, but we will have to discuss further to determine where the disconnect is and resolve." (JA 27 ¶ 105; JA 240-41, 283-84.)

When Ms. Escalante, Charlton and Gessel determined that BT and the client were unable to come to an agreement as to an acceptable part-time schedule for Ms. Ranade, Ms. Escalante notified Ms. Ranade that as of October 6, 2010, the Company could no longer support the four-hour schedule she had been working since September 23, 2010. (JA 29 ¶ 116; JA 262-63.) Ms. Ranade was then offered the following options: (1) take continuous, full-time FMLA leave; or (2)

20

speak with her physician about having the restriction lifted and return to work full time.  (JA 29 ¶ 116; JA 262-63.)  Ms. Ranade testified that as an additional option she could have asked to be removed from the Unilever project and placed "on the bench" in a paid capacity until a new, part-time engagement became available for her.[2]  (JA 29 ¶ 117; JA 95, 103.)

The following day, October 6, 2010, Ms. Ranade returned to work with a note from her physician completely lifting the four-hour work restriction.  (JA 29 ¶ 118; JA 272, 293.)  It is undisputed that from the day after BT received notice of Ms. Ranade's need for part-time leave, to October 5, 2010 (the last day her physician certified Ms. Ranade as requiring a medical accommodation), BT provided Ms. Ranade with an abbreviated four-hour per day schedule.  (JA 29 ¶ 116; JA 262-63.)  As of October 6, 2010, it is also undisputed that Ms. Ranade had no certified medical restrictions and there were no further communications with Ms. Ranade regarding FMLA leave.  (JA 29 ¶ 119; JA 272).  It was not until nearly six months later, and after being "asked off" a project by a third client, that Ms. Ranade's employment was terminated.  (JA 24-25 ¶ 89, JA 25 ¶ 90; JA 122-23, 302.)

---

[2] "On the bench" refers to the paid time period when a consultant is not actively engaged in a client project.  Generally, consultants are placed on the bench between projects.  (JA 29 ¶ 117; JA 95, 103.)

# SUMMARY OF THE ARGUMENT

Ms. Ranade's appeal is different from most in that she did not dispute BT's statement of facts before the district court. Since Ms. Ranade has not appealed the district court's determination that it was entitled to deem BT's facts as admitted, she has abandoned any such argument. The undisputed facts, which are supported by reams of contemporaneous correspondence, provide overwhelming evidence that BT neither interfered with, nor retaliated against Ms. Ranade for exercising her FMLA rights. Whereas, Ms. Ranade's evidence of FMLA discrimination is mere speculation; she did not even bother taking a single deposition of a fact witness.

Further, even though Ms. Ranade only pleaded a generalized claim of a "willful violation" of the FMLA, the district court analyzed the claim under two potential legal theories: interference and retaliation for exercising FMLA rights. As the district court correctly concluded, there is no support for a claim that BT interfered with Ms. Ranade's FMLA rights as it is undisputed that BT fully accommodated Ms. Ranade's nine-day FMLA reduced work schedule. Indeed, Ms. Ranade appears to have abandoned her claim that BT did not accommodate her FMLA leave. Rather, Ms. Ranade claims that BT violated the FMLA when it advised her of its inability to continue to grant her part-time leave and offered her full-time FMLA leave instead. Neither argument, however, states a claim for

FMLA interference as a matter of law. Ms. Ranade elected to return to work full-time and submitted a doctor's note permitting her to work without restrictions. Any entitlement to a leave of absence or a claim of interference under the FMLA was extinguished upon presenting the doctor's note clearing her for full time work.

Additionally, Ms. Ranade cannot establish prejudice from any alleged interference with FMLA leave rights, which is a prerequisite to any such claim. It is undisputed that Ms. Ranade maintained the same position, pay and benefits before and after her nine-day FMLA leave. Ms. Ranade's new claim that she made an "informal" FMLA request sometime in July or August 2010 also fails because, again, she cannot establish any prejudice.

Lastly, Ms. Ranade's retaliation claim fails because she cannot establish any causal connection between her FMLA leave and actions taken by BT, including the termination of her employment six months after the FMLA leave expired. As the district court held, BT presented "ample support" for the non-discriminatory reasons for Ms. Ranade's negative performance evaluations, placing Ms. Ranade on a Performance Improvement Plan and, ultimately, terminating her employment. Indeed, the fact that three clients requested Ms. Ranade's removal from their projects (along with the performance plan) was the primary causal connection for the job actions taken by BT. Whereas, Ms. Ranade could not present any direct evidence linking her nine-day FMLA leave and her termination six months later.

23

Instead, Ms. Ranade ignores the overwhelming evidence that her unfavorable

performance reviews, placement on a Performance Improvement Plan and, her

discharge were linked directly to her client's unfavorable view of her performance

and not remotely related to her FMLA request.

## ARGUMENT

The district court determined that Ms. Ranade could not show any evidence of interference or retaliation with her FMLA rights.  Further, Ms. Ranade has not presented any new argument that merits a different determination.

## I.    GOVERNING LEGAL STANDARDS

To overturn the district court's rejection of her FMLA claim, Ms. Ranade must show a genuine dispute of material fact, such that a reasonable jury could find for her at trial.  Fed. R. Civ. P. 56(c); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  In employment discrimination cases, the genuineness and materiality components of Rule 56(c) require that plaintiffs do more than just disagree with employers' business decisions, as courts are not authorized "decision makers of last resort in personnel matters."  *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).

In reviewing the district court's summary judgment decision, this Court applies *de novo* the same standards as the district court.  *Boitnott v. Corning Inc.*, 669 F.3d 172, 175 (4th Cir. 2012).  Here, Ms. Ranade contends that BT willfully violated the FMLA by denying her request for leave, presenting her with negative performance evaluations, placing her on a PIP and, ultimately, terminating her employment.  (JA 7-10.)  While Ms. Ranade failed to identify the nature of the

claims under her one-count FMLA complaint, the district court nevertheless fully analyzed potential FMLA interference and retaliation claims.

Under the FMLA, an eligible employee suffering from "a serious health condition that makes [her] unable to perform the functions of her position" is entitled to 12 weeks of leave during any 12-month period.  *See* 29 U.S.C. § 2612(a)(1)(D).  The statute makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an FMLA right.  *Id*. at § 2615(a)(1).  In addition, an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by th[e] subchapter," thus prohibiting retaliation against an employee invoking FMLA rights.  29 U.S.C. § 2615(a)(2); *see also Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 971-72, n.2 (E.D. Va. 2012) (setting forth an employee's prescriptive and proscriptive rights under the FMLA) (citing *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).

## II.    BT'S STATEMENT OF FACTS WAS UNDISPUTED AND, STANDING ALONE, WARRANTS SUSTAINING THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT.

Ms. Ranade neither disputes that she failed to file a statement of disputed facts as required by the local rules, nor appeals from the district court's determination that she "failed to file" a required statement of disputed facts.  (JA 660.)

The district court properly held that Ms. Ranade's failure to have filed a statement of disputed facts entitled the court to "'assume that facts identified by the moving party in its listing of material facts are admitted.'" (JA 660) (quoting E.D. Va. Local Civ. R. 56(B).) *See also Lake Wright Hospitality v. Holiday Hospitality Franchising, Inc.*, 2009 U.S. Dist. LEXIS 73903 (E.D. Va. Aug. 20, 2009) (because plaintiff violated the substantive requirements of Local Civil Rule 56(B) by "fail[ing] to controvert defendants' list of undisputed material facts," defendants' facts were deemed admitted); *Foglia v. Clapper*, 885 F. Supp. 2d 821, 823 (E.D. Va. 2012) (moving party's list of undisputed material facts deemed admitted where opposition included section titled "Statement of Disputed Material Facts" but did not identify which material facts asserted by moving party were disputed."); *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (moving party's statement of undisputed facts deemed admitted where opposition consisted of "narrative that did not identify with any specificity which facts, if any, were disputed.").

Since Ms. Ranade has not appealed the district court's determination that it was entitled to deem BT's statement of facts admitted, she has abandoned any such argument on appeal as a matter of law. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 253 n.6 (4th Cir. 1999) (citing *11126 Baltimore Boulevard, Inc. v. Prince George's County*, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (*en banc*), *overruled*

27

*on other grounds by City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004)).  Accordingly, Ms. Ranade may not raise factual contentions for the first time before this Court when she failed to do so before the district court.

BT's statement of undisputed material facts (*See* JA 11-31) – standing alone – warrants sustaining the district court's award of summary judgment.  Indeed, other than her rank speculation to the contrary, Ms. Ranade has no factual basis to contradict or infer pretext from the reams of documentation produced by BT substantiating its legitimate, nondiscriminatory reasons for issuing her declining performance reviews, placing her on a PIP, and ultimately terminating her employment after being asked off several key client engagements.  In fact, Ms. Ranade did not depose a single fact witness.  BT relied on the feedback provided directly by its clients, relayed that feedback to Ms. Ranade, and made its discharge determination based primarily on those communications.  On the other hand, Ms. Ranade was not a party to those direct communications with the client and, therefore, has no basis to contradict them, nor to dispute BT's reliance on them.  Accordingly, the overwhelming evidence supports the district court's grant of summary judgment.[3]

---

[3] Even though the district court determined that it was entitled to deem BT's facts as admitted, it nevertheless "considered all of Plaintiff's factual allegations, along with Plaintiff's exhibits, and still finds that Plaintiff has not created a genuine issue of material fact for trial in this case."  (JA 660-61.)

## III.  THE DISTRICT COURT CORRECTLY HELD THAT MS. RANADE COULD NOT SUSTAIN AN FMLA INTERFERENCE CLAIM.

The Court should uphold the district court's dismissal of Ms. Ranade's FMLA interference claim.  Ms. Ranade claims that her FMLA rights were interfered with when BT required her to return to work without granting her an entirely flexible four hour schedule.  The district court correctly granted summary judgment because Ms. Ranade herself acknowledged that BT provided her with a reduced work schedule for the entire period that her doctor certified that she suffered from a "serious health condition."  Furthermore,  it is undisputed that at all relevant times, BT protected Ms. Ranade's FMLA rights by offering her full-time FMLA leave when it was determined that the business could no longer support a part-time schedule.

To sustain her interference claim past summary judgment, Ms. Ranade had to show that: (1) she was entitled to FMLA leave, meaning she had a "serious health condition" that "necessitated" leave; (2) she gave BT adequate notice of her need for leave for such condition; and (3) BT denied her FMLA benefits to which she was entitled.  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 924 (4th Cir. 2007); *see also* 29 U.S.C. § 2617.  A decision on any one of these factors suffices to uphold the district court's decision.  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  Further, Ms. Ranade must "prove not only the fact of interference, but also that the

violation prejudiced her in some way." *Anderson v. Discovery Commc'ns, LLC*, 517

Fed. Ap'x 190, 197 (4th Cir. 2013) (citing *Ragsdale*, 535 U.S. at 89).

    A.    BT Accommodated Ms. Ranade's Request For A Reduced Work
           Schedule During the Nine-Day Period That She Qualified For
           <u>FMLA Leave</u>.

Based on the undisputed facts – all of which are derived directly from BT's

contemporaneous business records, and some of which were composed by Ms.

Ranade – she cannot sustain a claim for FMLA interference.  During the handful of

days that Ms. Ranade's doctor certified that she was suffering a "serious health

condition," BT permitted her to work the requested four-hour schedule and, by her

own contemporaneous written admissions, Ms. Ranade confirmed to BT that she

worked only four-hour days during the entirety of her approved FMLA leave.  (JA

27-28 ¶ 110, JA 28-29 ¶ 115; JA 258.)  Accordingly, the district court properly

determined that "[i]t is not disputed that throughout the nine-day period that Ms.

Ranade qualified for a reduced work schedule under the FMLA, BT

accommodated her."  (JA 662.)

Further, and consistent with the district court's holding, Ms. Ranade cannot

demonstrate that after October 5, 2010, she suffered from a "serious health

condition" that would have entitled her to FMLA leave as a matter of law.  The

district court correctly held that (1) on October 6, 2010 "Ms. Ranade's eligibility

for FMLA leave ceased when she provided BT with documentation from her

doctor clearing her to return to work full-time;" and (2) it was undisputed "that after October 6, 2010, [Ms. Ranade] returned to a full-time schedule with the same salary and benefits she had prior to taking leave, and that BT accommodated her ongoing physical therapy."  (JA 662.)  It is also undisputed that Ms. Ranade performed her job functions on a full-time basis without any subsequent requests for time-off or need for leave.  (JA 29 ¶¶ 118-20; JA 106, 177 ¶ 12, 272, 293.)  Finally, Ms. Ranade testified that, after submitting the October 6, 2010 doctor's note lifting the restriction, no one at BT ever again mentioned her FMLA leave request.  (JA 29 ¶ 120; JA 106, 177 ¶ 12.)

> B.   When BT Could No Longer Sustain Ms. Ranade's Requested Reduced Work Schedule, BT Met Its FMLA Obligations By Offering Her Full-Time FMLA Leave.

The basis for Ms. Ranade's interference claim, then, appears to stem from BT's inability to continue to sustain her part-time leave schedule, and its offer to her to take continuous full-time FMLA leave instead.  As the district court held, however, "neither of these arguments are availing because, even assuming both are true, neither would demonstrate that BT failed to fulfill its obligations under the FMLA."  (JA 662.)

The FMLA's implementing regulations recognize that an employer has flexibility in attempting to accommodate requests for intermittent leave or a reduced leave schedule.  The regulations require that employees needing such

31

leave "attempt to schedule [it] so as to not disrupt the employer's operations." 29 C.F.R. § 825.117. In addition, they provide that "[t]he employee and the employer shall attempt to work out a schedule which meets the employee's needs without unduly disrupting the employer's operations." 29 C.F.R. § 825.302(f).

Here, BT provided Ms. Ranade with a schedule of 8:00 a.m. to 12:00 p.m., five days a week, based on the four-hour per day restrictions by her doctor, which Ms. Ranade accepted. (JA 26 ¶¶ 101-02; JA 133, 234, 236, 238-39.) It was only after BT was informed by the client Ranade's four-hour fixed schedule was unworkable as it did not provide sufficient coverage for the project, that BT determined that a mutually acceptable part-time schedule could not be realized. (JA 27 ¶¶ 106-07, JA 29 ¶ 116; JA 234-35, 262-63, 280-81, 286.)

On October 5, 2010, BT advised Ms. Ranade that she had the option of taking a full-time continuous FMLA leave or returning to work with no restrictions, if medically cleared to do so. (JA 29 ¶ 116; JA 262-63.) As the district court noted, Ms. Ranade testified that a third option was available to her, being placed "on the bench" and receiving full pay and benefits until BT could find a suitable part-time assignment for her. (JA 663; JA 29 ¶ 117; JA 95, 103.) The district court correctly held that "[g]iven these uncontroverted options, Plaintiff's claim that she was 'advised repeatedly and in no uncertain terms that BT could not accommodate her request for leave under the FMLA,' . . . is incorrect." (JA 663.)

32

BT never suggested, proposed or required Ms. Ranade to return to work on a full-time basis in lieu of taking FMLA leave. (JA 29 ¶ 116; JA 262-63.) Rather, Ms. Ranade elected to return to a full-time schedule, and the following day, October 6, 2010, submitted a doctor's note reflecting that she was medically cleared to work without restrictions. (JA 29 ¶ 118; JA 272, 293.)

BT unquestionably met its obligations under the FMLA by immediately granting Ms. Ranade's request for a reduced schedule and, thereafter, attempting to secure that schedule for her through numerous communications with the client. (JA 27 ¶¶ 106-07; JA 234-35, 280-81, 286.) Once BT determined that an arrangement with the client was not feasible, as the alternative options proved either unduly disruptive to the company's operations or incapable of guaranteeing BT's compliance with Ms. Ranade's doctor's directive, BT then presented Ms. Ranade with the option of either taking continuous FMLA leave or returning to work without restriction. (JA 29 ¶ 116; JA 262-63.)

In any event, irrespective of Ms. Ranade's reason for declining to take continuous FMLA leave, within 24 hours of learning that BT and the client could not support a four-hour reduced-leave schedule, Ms. Ranade provided a doctor's note clearing her for full-time work. Thus, any entitlement to a leave of absence or claim of interference under the FMLA was extinguished as a matter of law when Ms. Ranade provided a doctor's note clearing her for full time work.

The district court properly determined that "[t]he options offered by BT fulfilled its obligations under the FMLA and were entirely reasonable in light of BT's policy and need to manage its employees.  Because Ms. Ranade worked from home, BT's determination that a schedule of four hours 'haphazard[]… flex time per day' was 'not manageable for the business' was reasonable given BT's need to track Ms. Ranade's time, ensure compliance with the FMLA, and limit its own liability."[4]  (JA 663.)  Additionally, the district court held,

> Plaintiff's decision to schedule an appointment with her doctor, and her doctor's subsequent approval of her return to full-time, was her choice in light of the other options presented by BT.  Plaintiff can point to no evidence in the record that BT threatened her job (explicitly or implicitly) or required her to come back to work full time, as opposed to taking continuous FMLA leave or moving to the "bench."  Rather, the email traffic from October 5 and 6 clearly demonstrates that Ms. Ranade simply chose one of several options available to her at the time.  BT's obligations under the FMLA lapsed when Ms. Ranade's doctor officially cleared her to return full-time, with no restrictions.  Because it is undisputed that BT accommodated Ms. Ranade's request for a reduced schedule on each and every day that she qualified for FMLA leave, a reasonable jury could not conclude that BT interfered with Ms. Ranade's rights under the FMLA.

(JA 664.)

---

[4] Further, Ms. Ranade admitted that she misled BT about complying with the four-hour restriction despite her written representations to BT to the contrary, underscoring BT's need for a fixed schedule.  (JA 308, 326, 664.)

C.     There Is No Record Support For Ms. Ranade's Interference Claim Based On An Alleged "Informal Request" On An Unidentified <u>Date In Summer 2010</u>.

Ms. Ranade now contends that her interference claim also includes an alleged "informal request" sometime in July/August 2010 "for a reduced work schedule" that was purportedly denied by her manager, Ms. Charlton.  (Brief 5, 27.)  However, Ms. Ranade has not provided any documentation supporting this alleged "informal request" or that she had a qualifying serious health condition.  In fact, the only medical documentation provided by Ms. Ranade related to her "formal" FMLA request in September 2010.  (JA 162-65.)  Tellingly, the doctor writes that Ms. Ranade was treated only on June 28, and September 16 and 17.  (JA 163.)  Thus, Ms. Ranade *was not even treated by her doctor in July or August* – the time period Ms. Ranade identifies as medically requiring a reduced schedule.[5]

Where an employee fails to give notice of the need for a leave of absence, the employer does not violate the FMLA.  *Reid v. Hospira, Inc.*, 2010 U.S. Dist. LEXIS 131836, at *12-13 (E.D.N.C. Dec. 13, 2010) (citing *Peeples v. Coaster Office Pride*, 64 F. App'x 860, 863 (4th Cir. 2003)).  Because Ms. Ranade never sought or applied for leave in July/August, other than possibly requesting time off

---

[5] The doctor's certification referenced that Ms. Ranade received physical therapy in July and August 2010.  (JA 163.)  It is undisputed that BT accommodated all physical therapy requests made by Ms. Ranade.  (JA 25 ¶ 95; JA 108, 587, 662.)

35

for physical therapy (which was granted), Ms. Ranade cannot establish that she put BT on notice that leave was needed.

An employer may require that employees comply with its usual and customary notice and procedural requirements for requesting FMLA leave, *see* 29 C.F.R. 825.302(d), and an employer is not required to grant FMLA leave to an employee who failed to do so. *Rhoads v. FDIC*, 257 F.3d 373, 383 (4th Cir. 2001); 29 U.S.C. §§ 2613(a), 2613(b)(4)(B)); *see also Righi v. SMC Corp.*, 632 F.3d 404, 411-12 (7th Cir. 2011) (affirming dismissal of FMLA interference claims because plaintiff failed to comply with the employer's policy requiring notice of a leave's expected duration).

There is no dispute here that Ms. Ranade was familiar with FMLA policy requirements for providing adequate notice of a need for leave. When Ms. Ranade required a reduced schedule, she contacted Human Resources to request the necessary paperwork, which she received the very next day. Further, Ms. Ranade provided a medical certification within days. Ms. Ranade, however, took none of those actions when making the alleged July/August 2010 "informal request" for reduced hours and/or time off for physical therapy. In fact, Ms. Ranade cannot even identify the month she actually made this alleged informal request. Further, without any medical documentation or details relating to the nature of the request, the exact limitations, and the duration of the requested leave, BT could not have

36

possibly known that Ms. Ranade was requesting FMLA leave for a serious health condition. The FMLA does not require employers to be clairvoyant. *DeLaRama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008) ("The FMLA does not require the employer to play Sherlock Holmes, scanning an employee's work history for clues as to the undisclosed true reason for an employee's absence" or benefits the employee might need.).

> D.   Ms. Ranade's FMLA Interference Claim Fails As A Matter Of Law Because She Cannot Establish Any Prejudice Caused By The <u>Alleged Interference</u>.

The Fourth Circuit has recognized that an employee seeking relief under the theory of interference with an FMLA entitlement must establish that the interference actually prejudiced her in some way. *Anderson*, 517 F. App'x at 197 (citing *Ragsdale*, 535 at 89). "Such prejudice can be proven by showing that [the employee] lost compensation or benefits 'by reason of the violation, . . . sustain[ed] other monetary losses 'as a direct result of the violation,' . . . or suffer[ed] some loss in employment status remediable through 'appropriate equitable relief.'" *Id.* (citation omitted). *See also Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 924 (4th Cir. 2007) ("Prejudice exists where the employee loses compensation or benefits by reason of the violation.").

Here, Ms. Ranade does not contend, let alone prove, any of these required injuries. Ms. Ranade did not lose any compensation or benefits, nor did she suffer

loss in employment status as a result of BT's inability to extend her reduced leave schedule beyond the handful of days for which she was medically certified for the leave. To the contrary, Ms. Ranade was a salaried employee, who was fully paid and retained her benefits during the entire nine days of her FMLA-approved leave. It is also undisputed that at the conclusion of her leave period – as certified by her doctor – she maintained the same position, pay and benefits as she had prior to requesting leave. Similarly, Ms. Ranade's claim of an alleged "informal" request for a reduced schedule sometime in July or August, which was purportedly denied, similarly fails as a matter of law because she cannot demonstrate any injury to her compensation, benefits or employment status whatsoever.

The circumstances at hand are analogous to those in *Anderson v. Discovery Commc'ns*. In that case, Anderson was diagnosed with a sleep disorder and requested that Discovery agree to a proposed work schedule that would only require her to be in the office between 11 a.m. and 4 p.m. *Id.* at 192. Discovery denied the request on the grounds that the proposed schedule would not enable Anderson to perform the responsibilities of her job. *Id.* Anderson elected to work a standard schedule for approximately two more months, at which point her employment was terminated. *Id.*

The Fourth Circuit affirmed the dismissal of Anderson's FMLA interference claim because she could not show that she suffered prejudice due to Discovery's rejection of her proposed reduced schedule. *Id*. at 197. As this Court explained:

> [T]he only injury Anderson alleged as a result of [her employer]'s alleged unlawful denial of her request for a reduced work schedule was that she was not permitted to work a reduced work schedule. She does not claim that she lost any compensation or benefits, sustained other monetary loss, or suffered loss in employment status as a result of the purported interference . . . As such, her interference claim must fail.

*Id*.

A similar conclusion should be reached here as there is no dispute that Ms. Ranade was paid all she was entitled to (i) when she purportedly made an informal request for reduced hours in July/August 2010; (ii) during the approved FMLA leave in September/October 2010; and (iii) upon her return to her full work schedule without medical restriction and in the same capacity and at the same compensation as before the FMLA leave. Ms. Ranade's inability to establish that she was prejudiced in any manner as a result of BT's alleged interference mandates dismissal of her FMLA interference claim as a matter of law.

## IV. THE DISTRICT COURT CORRECTLY HELD THAT MS. RANADE COULD NOT SUSTAIN AN FMLA RETALIATION CLAIM.

As the district court noted, Ms. Ranade did not make a retaliation claim in her complaint. Nevertheless, the district court considered Ms. Ranade's argument

that her performance evaluations, placement on a PIP, and the termination of her employment were in retaliation for her taking FMLA leave six months earlier.

To avoid summary judgment on such a claim, Ms. Ranade must first establish a prima facie case by showing that: (1) she invoked or attempted to invoke a right under the FMLA; (2) BT took adverse employment action against her; and (3) the adverse employment action was causally connected to her protected activity. *Ainsworth*, 851 F. Supp. 2d at 976 (citing *Yashenko*, 446 F.3d at 550-51). BT's burden is only one of production to offer a legitimate, non-discriminatory reason for the actions taken, and once the Company satisfies it, Ms. Ranade may only sustain a claim if she shows by a preponderance of the evidence that the stated justifications are in fact a pretext for retaliation. *Id.*

As the district court held, Ms. Ranade "has not presented evidence creating a genuine issue of material fact on the third element of her retaliation claim – causal connection – and her claim therefore fails." (JA 664-65.)

A.    The District Court Correctly Determined That Ms. Ranade's Evaluations And PIP Were Based On Well-Documented Poor Job Performance, And Did Not Remotely Suggest A Causal Connection To Her Request For FMLA Leave.

As the district court noted, Ms. Ranade was an at-will employee who could have been discharged for "any reason not in violation of her statutory or constitutional rights." (JA 665.) Further, the district court held that BT presented "ample support" for the non-discriminatory explanation that it was Ms. Ranade's

40

well-documented poor performance that merited her declining reviews and placement on a PIP. It is undisputed that Ms. Ranade's performance evaluation ratings began to decline as early as December 2009, *at least nine months prior to her request for FMLA leave*, and that her first removal from a client account – at the client's demand – was in November 2009, *10 months prior to her request for FMLA leave*. (JA 17 ¶ 4, JA 25 ¶ 91; JA 53, 133, 196-97, 224.) The record also clearly evidenced that Ms. Ranade's declining performance evaluations and ultimately, her placement on a PIP, were directly linked to her well-documented lack of communication skills and the interpersonal conflicts that developed between her and BT's clients; conflicts which resulted in an additional client requesting Ms. Ranade's removal from their project. (JA 16 ¶ 38, JA 16-17 ¶ 40, JA 17-18 ¶ 53, JA 19 ¶ 56; JA 70-71, 114, 137, 155-57.) By her own admission, Ms. Ranade "wasn't very good" with soft skills, including "relationship building," and acting "politically savvy" with clients; skills that were "always relevant in [her] profession because [she did] interact with the customers and other colleagues." (JA 17-18 ¶ 46; JA 58-61.)

In the third quarter of 2009, Ms. Ranade's performance rating was lowered from "Very Good" to "Good" shortly after P&G demanded her immediate removal from the account. (JA 17 ¶ 43; JA 53, 133, 196-97.) Ms. Ranade's contentions in her brief (Brief 14) that she was not removed from the P&G Mehoopany project

41

are contradicted by the record and her own admissions.  It is undisputed that she

was summarily removed from the engagement and notified that all

communications with P&G were to be "discontinued effectively [sic] immediately"

as she was "exiting this account today" due to her inexcusable performance.  (JA

155-57.)

Ms. Ranade attempts to create an issue of fact by asserting that the P&G

Mehoopany project "was only one" of several she was working on for P&G, which

she did well on. (Brief 22.)  The only support for that assertion is Ms. Ranade's

own summary of projects submitted in support of her September 2010 application

to be promoted to Principal.  The document, therefore, was created *prior* to her

being summarily removed from the client account.

Ms. Ranade similarly tries to create an issue of fact by pointing to her March

26, 2010 performance review as evidence of her satisfactory performance on the

P&G Mehoopany project.  Ms. Ranade fails to disclose that the portion of her

March 26, 2010 review addressing the Mehoopany project was "pasted [into the

document] by Ms. Charlton on behalf of Ms. Ranade."  (JA 143.)  In other words,

Ms. Ranade drafted the description and directed that it be input into her review.

Ms. Charlton's evaluation of Ms. Ranade's performance for the year, however,

noted the "challenges in Oct/Nov on P&G account," "2 deferments on Principal

title promotion" and "a few items relating to soft skills with communication and

42

relationship building that Nadine's Mgr would like her to take to consider, self-analyze, accept and apply. . ." *Id.*

Unfortunately, after a similar request for Ms. Ranade's premature removal (also citing communication problems and failure to follow chain of command) followed less than a year later, and from one of BT's largest global clients, Unilever, Ms. Charlton placed Ms. Ranade on a PIP. (JA 16-17 ¶ 40; JA 70-71.) These performance deficiencies and her continued failure to demonstrate the level of acumen, and business and interpersonal professionalism required for her role – *not* her need or request for FMLA leave – led directly to Ms. Ranade's placement on the PIP. Indeed, the PIP was prepared internally well before Ms. Ranade even requested medical leave and was issued on the heels of Unilever's request that Ms. Ranade be removed from the account; the second account that had requested her early removal due to poor performance (JA 19 ¶ 56; JA 114.) In light of the two-week period between Ms. Ranade's second client-initiated removal and her placement on the PIP, she simply has not established that her request for FMLA leave had any bearing on her declining performance ratings and placement on the PIP.

Ms. Ranade's argument that she was not asked to leave the Unilever project prematurely is not worthy of the Court's consideration. As both the PIP and the contemporaneous business records make clear, the August 2010 email traffic

43

concerning Ms. Ranade's requested early departure from Unilever was in response to the client's request that she be prematurely transitioned off the project four months early due to the "negative feedback" on her job performance, and not her alleged request that her hours be cut back.

In the same fashion, Ms. Ranade refers to the comments in her quarterly review as evidence of her success on the Unilever project.  (Brief 10.)  Ms. Ranade, however, conveniently ignores that the language commending her for doing a good job on the account was for the period of April to June 2010.  (JA 217.)  Putting aside this misrepresentation to the Court, Ms. Ranade's performance on the Unilever project from April through June 2010 is irrelevant as the time period at issue is August 2010, when Ms. Charlton was first notified by Desmond Kerr that Unilever had become dissatisfied with her job performance and requested her immediate removal.  In fact, the pertinent statements in her October 19, 2010 performance review confirm that Ms. Ranade "was faced with some challenges . . . that had some recurring themes and was thus placed on a PIP."  (JA 217.)  As noted, the "feedback rec'd" from project key stakeholders "indicates a need for improvement in communications protocol and in building sustainable relationships."  (*Id.*)

Again, there is no dispute that Ms. Charlton began drafting the PIP at least one week prior to September 13, 2010, the day Ms. Ranade first contacted BT's

44

human resources department to request FMLA paperwork, undermining any alleged connection between her leave request and placement on the PIP. (JA 19 ¶¶ 58-59; JA 199.) Furthermore, even if Ms. Ranade had given Ms. Charlton a so-called "informal" notice of her desire to have a reduced work schedule as early as July/August 2010 (which she did not), any such notification was still preceded by her premature removal from the P&G Mehoopany project for poor performance. (JA 15-17 ¶¶ 28-40; JA 67-73, 151-53, 155-57, 189-90, 192-94.) In addition, in August 2010, Unilever – independent of Ms. Charlton – requested Ms. Ranade's premature exit due to poor performance. (JA 18-19 ¶ 53; JA 137.) Ms. Ranade has presented no evidence to rebut BT's legitimate business reason for her placement on the PIP. *See Ash v. United Parcel Service, Inc.*, 800 F.2d 409 (4th Cir. 1986) (finding plaintiff's inference that he was treated more severely than other employees to be unsupported speculation, insufficient to defeat defendant's motion for summary judgment, where defendant put forth legitimate, nondiscriminatory reasons for its actions).

Importantly, the PIP specifically references Ms. Ranade's removal from both the Mehoopany and Unilever projects, as well as identifies the "communications" and "soft skills" deficiencies that plagued her performance on both accounts. (JA 207-08.)

45

B.    The District Court Correctly Determined That Ms. Ranade's Termination Was Based On Well-Documented Poor Job Performance, And Did Not Remotely Suggest A Causal Connection To Her Request For FMLA Leave Six Months Earlier.

Ms. Ranade's claim of retaliation based on her termination of employment similarly warranted dismissal.  She was discharged on April 1, 2011, approximately six months after her nine-days of part-time FMLA leave and immediately following her requested removal from a third client account.  (JA 24-25 ¶¶ 89- 90; JA 122-23, 302.)  After Ms. Ranade's completion of the PIP, she quickly reverted to her previous patterns of poor performance.  Specifically, on March 14, 2011, Ms. Charlton received an email from Mr. Upton relaying the client's feedback on Ms. Ranade's performance, including the very clear instruction that if the client were to assign any further business to BT, "they wanted a different PM [Project Manager]."  (JA 159.)  Mr. Upton then asked Ranade to stop work on the account and told her that she was to "finish up and move on."  (*Id.*)

The terms of the PIP specifically provided that Ms. Ranade could not be asked to prematurely exit a client project to due performance issues, and that continued satisfactory performance and no "backslid[ing]" were a requirement of her continued employment.  Accordingly, after Capital Group removed Ms. Ranade from any further work on the account, Ms. Ranade's employment by BT

46

was terminated effective April 1, 2011.  (JA 20-21 ¶ 65, JA 21 ¶ 69, JA 24-25 ¶¶

89-90; JA 87-90, 122-23, 204-15, 302.)

Ms. Ranade contends in her brief that Capital Group made positive

comments about her performance. (Brief 23.)  In fact, Ms. Ranade did receive a

favorable review from Capital Group in early January 2011, and Mr. Upton's

concerns about her performance in January 2011 were what he hoped were

"minor."  (JA 412.)  Two months later, however, on March 14, 2011, these

concerns went from minor to major as the client now requested that Ms. Ranade be

removed from the account entirely.  As summarized by Ms. Charlton directly to

Ms. Ranade, "I know this is hard feedback to receive as much as it is for me to

deliver given that some of these items still align with things we addressed during

your PIP. . . the client specifically asked David not to bring [you; Ms. Ranade]

back for the ongoing project work."  (JA 159.)  In sum, Capital Group would not

work with Ms. Ranade any longer and threatened not to do business with BT as

long as she remained on the account.  (*Id.*)  Capital Group referenced her

"communication/conversation challenges," work effort, distraction with other

things, prioritizing and their conclusion that they did not like Ms. Ranade and no

longer wished to work with her.

Ms. Ranade presented no evidence that her request for FMLA leave six

months earlier was in any way connected to her discharge.  In fact, when asked on

what basis she believed that she had been discriminated against by BT, Ms. Ranade responded, "It could be anything."  (JA 30 ¶ 126; JA 97.)  Since Ms. Ranade must rely solely on the timing of her protected activity to establish a causal connection, her claim of retaliation must fail because (1) the PIP was being drafted internally prior to Ms. Ranade's request for FMLA leave and (2) her termination of employment occurred six months after her request for leave, and well after the PIP had been completed.  (JA 19 ¶¶ 58-59, JA 24-25 ¶¶ 89-91; JA 122-23, 133, 199, 224, 302, 587.)

Accordingly, the temporal proximity of Ms. Ranade's request for leave and discharge is not only insufficient to establish the requisite causal link, but also undermines it.  As the district court correctly determined:

> Plaintiff's attempt to create a causal connection between her FMLA leave in September 2010 and her termination on March 31, 2011 is also undermined by her inability to present *any* direct evidence linking the two events.  It is undisputed that BT did not mention Plaintiff's FMLA leave or medical condition at the time she was terminated (or, for that matter, at any time after she returned full-time), except to accommodate her physical therapy schedule.  To the contrary, all reasonable inferences from the evidence in the record point in the opposite direction, supporting BT's explanation that it did everything it could to help Ms. Ranade improve her performance but ultimately terminated her when those efforts were unsuccessful.

(JA 666) (emphasis in original.)  The district court also aptly noted that the nearly six-month gap in time between the end of her FMLA leave and the discharge "is not prima facie evidence of a causal connection in the absence of

48

other evidence.  In fact, this Circuit has repeatedly held that time gaps even shorter than six month militate *against* a causal relationship. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding a delay of less than three months in an FMLA retaliation claim 'sufficiently long as to weaken significantly the inference of causation between the two events')."  (JA 666 n.8.)

## CONCLUSION

For the foregoing reasons and those stated in the district court's opinion, the

Court should affirm summary judgment for BT on Ms. Ranade's claim.

## REQUEST FOR ORAL ARGUMENT

Oral argument is hereby requested.

/s/ Jeremy M. Brown
Jeremy M. Brown
Epstein Becker & Green, P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 639-8259

David B. Tatge
Epstein Becker & Green, P.C.
1227 25th Street, NW, Suite 700
Washington, DC 20037
(202) 861-1875

*Counsel for Appellee*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains <u>11,482</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

/s/ Jeremy M. Brown
Jeremy M. Brown

Dated: May 8, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 8, 2014, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

Annette Kay Rubin
Attorney at Law
18 Liberty Street, SW
Leesburg, VA 20175
(703) 777-0034

*Counsel for Appellant*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA 23219